Filed 10/18/24  P. v. Landers CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B325465 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA476996-01) |
| v. | |
| VICTOR LANDERS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James R. Dabney, Judge.  Affirmed in part and remanded with directions.

Kelly C. Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Susan S. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Victor Landers appeals from his judgment of conviction after a jury found him guilty of murder, possession of a firearm by a felon, unlawful possession of ammunition because of a prior conviction, carrying an unregistered loaded handgun in a vehicle, and pimping. The jury also found true several firearm enhancements.

On appeal, Landers raises numerous claims: (1) his conviction for pimping was not supported by substantial evidence; (2) the trial court erred in failing to set aside the pimping charge under Penal Code[1] section 995; (3) the trial court erred in refusing to sever the pimping charge from the murder charge; (4) a prosecution expert impermissibly opined on Landers's guilt; (5) the trial court erroneously admitted prior consistent statements; (6) the trial court erroneously admitted impermissible character evidence; (7) the prosecutor committed prejudicial misconduct; (8) the cumulative effect of the combined errors violated Landers's rights; (9) the trial court erred in refusing to dismiss Landers's prior strike convictions and firearm enhancement; and (10) the abstract of judgment should be corrected to reflect a $300 restitution fine and $300 stayed parole revocation restitution fine. We agree the abstract of judgment should be corrected. Otherwise, we discern no error and affirm the judgment.

---

[1] All undesignated statutory references are to the Penal Code.

## PROCEDURAL AND FACTUAL BACKGROUND

I.  *The Information and Pretrial Motions*

The People charged Landers by an amended information with five counts:  murder (§ 187, subd. (a) (count 1)); possession of a firearm by a felon (§ 29800, subd. (a)(1) (count 3)); unlawful possession of ammunition because of a prior conviction (§ 30305, subd. (a)(1) (count 4)); carrying an unregistered loaded handgun in a vehicle (§ 25850, subd. (c)(6) (count 5)); and pimping (§ 266h, subd. (a) (count 7)).

As to count 1 (murder), the People alleged Landers personally used a firearm (§§ 12022.5, subd. (a), 12022.53, subd. (b)), personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and personally and intentionally discharged a firearm that caused great bodily injury or death (§ 12022.53, subd. (d)).  The People also alleged, as to count 1, that Landers had prior serious felony convictions (§ 667, subd. (a)(1)) and had served a prior prison term (§ 667.5, subd. (b)).  As to all the counts, the People further alleged Landers had two prior serious and/or violent felonies under the "Three Strikes law" (§§ 667, subds. (a)(1), (b)-(j); 1170.12).  The People also alleged several circumstances in aggravation under California Rules of Court, rule 4.421(a)(1).

Landers moved to sever count 7 from the rest of the counts, but the trial court denied the motion.

II.  *Prosecution Evidence at Trial*

On March 27, 2019, around 4:00 p.m., Tocana Toca, Landers's ex-girlfriend, was shot and killed in an alley behind an accounting office.  The accounting office belonged to her child's

3

grandfather, Ted McDaniel.  Toca occasionally went to McDaniel's office and helped with the work.

For several months leading up to the shooting, Landers and Reshay Williams were in a romantic relationship.  They lived together and spent all their time together.  Williams met Toca at a party and would see Toca around at social gatherings.  When Williams and Toca ran into each other, Toca would give Williams dirty looks.  Shortly before the shooting, Toca slashed Williams's car tire.

### A.    *The Shooting*

Several witnesses at trial testified about the shooting.

#### (1)    *Ted McDaniel*

On the day of the shooting, McDaniel saw Toca at his office between 10:00 a.m. and 12:00 p.m.  The office was on Martin Luther King Boulevard between 3rd Avenue and 4th Avenue.  At the office, Toca started putting on lipstick and grooming herself.  McDaniel knew that she was about to meet someone.

An hour later, McDaniel heard "maybe" five gunshots coming from the alley behind his office.  After hearing his secretary say Toca "went in the back to smoke a cigarette," McDaniel rushed outside to the back alley.  When McDaniel arrived, Toca was on the ground with paramedics.

#### (2)    *Reshay Williams*

On the day of the shooting, Williams drove a gray Hyundai to McDaniel's office where she knew Toca might be.  Williams planned to fight Toca for slashing Williams's car tire.  Williams brought along her friend Kneca Robinson, who sat in the

4

passenger seat.  Once Williams arrived near McDaniel's office, she parked her car and waited to see Toca.

While Williams was waiting in her car, Landers texted her, asking where she was.  After learning that Williams was near McDaniel's office, Landers asked Williams to pick him up.  Williams declined.

Landers then sent Williams several text messages.  He texted, " 'I wanna get this citch back because now I feel like she trying to set me up on the low.' "  Williams believed Landers was referring to Toca "trying to get him."  The word " 'citch' " meant "bitch."  He also texted, " 'I'm on my way over there, and you better be ready to get me up out of there after I dead this citch.' "  To " 'dead' " meant to kill.  After Williams told Landers how angry she was over Toca slashing her tire, Landers texted, " 'You mean citch the anger you feelen behind that shit aint nothing compared to how the fuck I'm feeling.' "  Williams believed Landers was referring to his anger about Toca slashing Williams's tire.  Landers further texted, " 'If you think I'm fittna let anybody get away wit disrespecting me you better think again.' "

After receiving Landers's text messages, Williams drove to the alley near McDaniel's office between 3:45 and 4:00 p.m.  She saw Toca in the alley having a "heated" conversation with Landers.  Both Toca and Landers looked frustrated and mad.  Then Landers fired shots at Toca.

Williams drove around the corner and stopped her car.  At that point, Landers got into her back passenger seat, and Williams drove off.  Williams dropped off Robinson, picked up another friend, and drove to the hotel where she and Landers were staying.

(3)    *Kneca Robinson*

Robinson testified that, on the day of the shooting, Williams picked up Robinson in a gray Hyundai. Williams told Robinson that she was planning to fight Landers's ex-girlfriend. Williams believed the ex-girlfriend had slashed her car tire.

Williams drove them to Martin Luther King Boulevard between 2nd Avenue and 3rd Avenue, where Williams believed the ex-girlfriend worked. As they waited to see the ex-girlfriend, Williams received several phone calls. During a call, a man asked, " 'Why you there without me?' " Williams laughed, and said she had "it on her own." Then Williams asked, " 'Why you coming?' "

After the calls, Williams drove and parked her car by an alley near Martin Luther King Boulevard and 3rd Avenue. Minutes later, Robinson heard six gunshots coming from the alley. Robinson tightly grabbed Williams, who appeared "super calm." When the gunshots stopped, Robinson saw an African-American man, carrying a backpack and wearing a dark blue shirt and dark blue pants. Williams drove off.

Robinson asked Williams if Williams was going to drop Robinson off, but Williams replied, " 'No. I'm going to pick up my nigga – Victor.' " At some point, Landers got into the car. He was carrying a backpack and dressed in the same-colored clothing as the man she had seen in the alley. Landers was mad and asked Williams, " 'Where in the fuck you at?' " Landers also said, " 'Fuck that bitch,' " and Williams laughed.

Williams then drove to a house where she picked up Landers's male and female cousins. Later, Williams dropped off Robinson.

### (4) *Other Witnesses*

On the day of the shooting, several other witnesses were near the alley on Martin Luther King Boulevard between 3rd Avenue and 4th Avenue. Between 3:45 and 4:00 p.m., they heard four to six gunshots. Afterwards, they all saw an African-American man walking away from the alley.

### B. *Landers's Unrelated Arrest on Weapons and Pimping Charges*

A week after the shooting, on April 2, 2019, Officers Michael Lynch and Christopher Ineguez of the Manhattan Beach Police Department pulled over a gray Hyundai in Manhattan Beach. Williams was driving, and Landers was in the passenger seat. A records check of Williams revealed she had active warrants for soliciting prostitution. Williams admitted she was a prostitute.

During a search of the Hyundai, the officers found a loaded, unregistered gun under the front passenger's seat, where Landers had been sitting. In the glove box, the officers found ammunition, an ATM card with Landers's name on it, and a cell phone. Landers admitted the phone was his. The cell phone kept receiving messages from "Plenty of Fish," a dating website. The officers also found a box of condoms, women's clothing, and lingerie.

Before the officers searched the Hyundai, they put Landers and Williams in a patrol car. A video camera inside the car recorded the conversation between Landers and Williams. At trial, the prosecutor played part of the video for the jury. In the video, Landers looked outside the patrol car and said, "They found the billy." "Billy" is slang for a gun. Landers told

Williams, "Just keep – just keep to the same program. Don't be doing outcalls. The posts." Landers asked one of the officers, "[C]an you all just give my girl a ticket for her warrants and let her go? I don't want her getting caught-up in my bull-shit."

The officers arrested both Landers and Williams and took them to jail. During booking, Ineguez searched Landers and found a hotel room key, Williams's identification card, and Williams's ATM card. Williams said that the key was for a hotel room "on Imperial" in Los Angeles. Ineguez noticed Landers had two tattoos: the Monopoly character "Top Hat" and the words "Tiny Loc Pimp."

  C. *Expert Testimony About Pimping*

Ineguez had training in and experience with prostitution, pimping, and other vice-related crimes. He testified that Imperial Highway, the street where the hotel was located, was known for prostitution. Prostitutes walked along that street or performed "out calls." An out call was when a prostitute leaves the street and meets the customer elsewhere. To perform out calls, prostitutes would often use dating websites, such as Plenty of Fish.

Ineguez testified that a "majority" of the pimps he arrested had Landers's "Top Hat" tattoo, which meant "they're all about money, getting money, were out for money, trying to get paid." Landers's "Tiny Loc Pimp" tattoo meant "Tiny Crazy Pimp." Ineguez testified it is common for pimps to carry a weapon to protect themselves or their prostitutes. Also, "pimps will hold ID, money, ATM cards of their prostitutes for control. [¶] They will manage their money, and they will basically tell them what they can spend and what they can't." Based on Ineguez's training and

experience, he opined the circumstances surrounding Landers's arrest were consistent with pimping.

### D. *The Investigation*

#### (1) *Autopsy*

Toca's autopsy revealed that she died on March 27, 2019, at 4:10 p.m. of gunshot wounds to the head and chest. She had 14 gunshot wounds. Dr. Matthew Miller, a Deputy Medical Examiner for Los Angeles County, reviewed Toca's autopsy report. Dr. Miller noted the coroner recovered several bullets from Toca's body. Additionally, Dr. Miller opined that four of Toca's gunshots wounds were possibly consistent with Toca and the shooter facing each other when Toca was shot.

#### (2) *Firearms Evidence*

Shortly after the shooting, Detective Nancy Johnson of the Los Angeles Police Department (LAPD) collected multiple cartridge casings from the crime scene. Later, Annette Woiwode, a LAPD Criminalist, did a firearms and ballistics analysis. Woiwode test-fired the gun from Landers's arrest and collected several cartridge casings and bullets. Woiwode then compared the test-fired cartridge casings with the crime-scene cartridge casings, and compared the test-fired bullets with the bullets from the coroner. She concluded the gun from Landers's arrest fired both the crime-scene casings and the bullets from the coroner.

#### (3) *Surveillance Videos*

On the day of the shooting, LAPD Detective Clifton Rose went to the crime scene and obtained surveillance camera videos from two houses nearby. The prosecutor played both videos for the jury.

9

One house had two cameras—one capturing the north side of the house and the other capturing the south side. The north-side camera showed a person with a dark complexion and thin build walking on 3rd Avenue at 3:57 p.m. The person was wearing a dark top, light pants, and dark shoes. The south-side camera showed someone getting into the backseat of a gray car that had stopped in the middle of a street. After that, the person walking on 3rd Avenue was not seen again.

The second house's camera showed a gray Hyundai driving northbound on 3rd Avenue at 3:52 p.m. At 3:57 p.m., the same gray Hyundai drove northbound on 3rd Avenue, stopped, backed up, made a three-point turn, and drove southbound. The Hyundai was consistent with William's car.

After Rose obtained the videos, he spoke with McDaniel. McDaniel told Rose that Landers should be a person of interest. Rose ran Landers's name in the police database. He discovered Landers had been arrested on April 2, 2019, and the arrest involved a gray Hyundai. Rose then ran the Hyundai's license plate number and learned the car had been at the Los Angeles Inn and Suites hotel.

Rose went to the hotel and got its surveillance videos. The prosecutor played parts of the videos for the jury and showed still images from the videos to the jury. The videos and still images showed that an hour after the shooting, at 5:13 p.m., a gray Hyundai drove into the hotel parking lot. There was a driver, front seat passenger, and two backseat passengers inside the car. A woman got out of the backseat and gave money to the hotel's office manager.

The Hyundai then parked in the hotel parking lot. The front seat passenger, who resembled Landers, got out of the car.

10

The person resembling Landers was wearing light colored pants and dark colored shoes—the same outfit as the person from the crime-scene video.

The footage showed that, later that night, Williams was inside the hotel's front office.  After that, a man resembling Landers came out of a hotel room and took a black backpack from the Hyundai.

(4)     *Cell Phone Evidence*

LAPD detectives retrieved data from Williams's and Toca's cell phones.  Williams's phone had text messages between her and Landers.  There were 15 text messages between them 20 minutes before the shooting.  There were also text messages between them about going on dates with other people.  On March 24, 2019, at 6:42 p.m., Williams texted Landers, "I'm doing the date."  On March 30, 2019, at 8:21 p.m., Landers texted Williams, "How long is your date?"

Toca's phone also had several text messages between her and Landers from the day of the shooting.  The two had agreed to meet in an alley.  The final text message between them was 25 minutes before the shooting.  Toca called Landers at 3:40 p.m.

Detectives analyzed the location of Landers's, Williams's, and Toca's cell phones based on call records and cell tower data.  The data revealed that Landers's phone was at the crime scene around 3:40 p.m.  The records also showed calls to Williams from Landers (1) between 3:53 p.m. and 3:57 p.m. from near South 3rd Avenue and Martin Luther King Boulevard, and (2) between 6:19 p.m. and 10:17 p.m. from around the Los Angeles Inn and Suites hotel.

Shortly after Williams was arrested, LAPD detectives
placed an undercover informant, posing as a fellow inmate, in
Williams's jail cell and secretly recorded their conversation.  This
tactic is commonly called a *"Perkins* operation."[2]  To get Williams
to talk to the informant, LAPD Detective Armando Mendoza
came by William's jail cell three different times and gave her
limited information.  The information was designed to make
Williams feel like a target in the police investigation.  At trial,
the prosecutor played a recording of the entire *Perkins* operation
for the jury.

At the beginning of the *Perkins* operation, the undercover
informant asked Williams why she was in jail.  Williams said she
was in jail for "warrants" and because police were investigating a
murder.  Williams suspected the murder involved the "beef"
between her and an "older lady."  The older lady had a "little
thing" with Landers and was mad at Williams because Williams
was Landers's new younger girlfriend.  As a result, the older lady
slashed Williams's car tire.  Other than that, Williams insisted
she did not know anything about the murder.

At that point, Mendoza came by Williams's cell and told her
that he and his partner wanted to talk to her about "an incident

---

[2]  In *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*), the
United States Supreme Court held a criminal suspect who makes
incriminating statements is not entitled to warnings under
*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), "when the
suspect is unaware that he is speaking to a law enforcement
officer and gives a voluntary statement."  (*Perkins*, at p. 294.)

that occurred on March 27th of this year over off of 19 McKinley and 3rd Ave." After Mendoza left, Williams continued to insist she did not know what happened or the location of the incident.

Mendoza then came by a second time and told Williams, "Miss Toca is dead." He also told Williams that he was going to show her "some stuff," including "GPS on the rental car . . . and video." After Mendoza left, Williams told her cellmate multiple times that Landers "probably" killed Toca. Williams also repeatedly insisted that she did not do anything besides pick Landers up around 3:00 p.m. or 4:00 p.m. and drop him off.

When Mendoza came by Williams's cell for the third time, he said, "We see you back up, wearing the bandana. . . . [I]t's you or him."[3] After Mendoza left, Williams said, "I am not going down for this shit," and repeatedly said that she did not do anything.

Shortly after the *Perkins* operation, Mendoza and Rose formally interviewed Williams. The detectives recorded the entire interview, but the prosecutor played only the introductory portion for the jury. In the introductory portion, the detectives gave Williams her *Miranda* rights, asked Williams background questions, and told Williams to tell the truth. Mendoza testified that during the interview Williams said the gun Landers used to shoot Toca was the same gun that officers later found during Williams's arrest. Overall, Williams's statements in her

---

[3] Mendoza initially testified that he did not say "it's you or him." During a sidebar conversation, the prosecutor stated that her copy of the transcript quoted Mendoza as saying, "it's you *and* him." (Italics added.) However, after the prosecutor played the entire *Perkins* operation video for the jury, both the prosecutor and Mendoza agreed that Mendoza said, "it's you or him."

13

interview were consistent with the statements she made during the *Perkins* operation.

III.    *Defense Evidence at Trial*

Landers testified at trial. He testified he met Williams in 2018 and they had a sexual relationship until they were both arrested in April 2019. He met Toca in high school. They had sex and were, as he described, "friends with benefits."

On the day of the shooting, Landers went to the alley by Martin Luther King Boulevard between 3rd and 4th Avenues to meet Toca. Toca had asked Landers to meet her because she wanted things that she left at his aunt's house. When Landers told Williams he was planning to meet Toca, Williams was already looking for Toca because she was upset that Toca had slashed her car tire. Landers was also upset about that.

Landers testified about text messages he sent Williams before he met up with Toca. Landers explained that when he texted Williams, " 'I want to get this citch bad because now I feel like she trying to set me up on the low,' " he meant he wanted to "get rid of" and "move forward from" Toca because Toca was threatening his relationship with Williams. When he texted, " 'I'm on my way over there, and you better be ready to get me up out of there after I dead this citch,' " he meant he was going to end his relationship with Toca.

Landers testified that he owned the gun that killed Toca, but that he did not take the gun with him when he met Toca in the alley. Instead, Williams had his gun. When Landers got to the alley, Toca was already there. Williams then arrived in the alley and the three of them started talking. Williams was trying to fight Toca. Williams said, " 'Bitch, you slashed my tire. You jealous bitch. You mad you can't keep a nigger.' " Toca laughed

14

at Williams and said, " 'Look here, little girl, I'm not bout fight you over no nigger.' "  Williams then lunged at and grabbed Toca. At that moment, Landers pulled Williams back.  Toca then took out a knife and said, " 'I'm not bout to fight you, so what you want to do?' "  In response, Williams reached into her purse, pulled out Landers's gun, and shot Toca.

Williams and Landers left the alley in opposite directions. Landers "started power walking and thinking" he needed to get away from Toca.  The closest person with a car was Williams, so he called her.  Williams did not answer, but as he was calling her, he saw her at the corner and got into her car.  Landers admitted he was the man getting into a car by the alley in the surveillance video.

Landers admitted he and Williams kept the gun between the shooting and his arrest, and that the ammunition in the Hyundai's glove compartment belonged to him.  Also, between the shooting and his arrest, Landers and Williams stayed at a hotel.  Landers knew Williams was prostituting during that time. Landers helped Williams arrange her prostitution work by letting her use his phone, but he did not control or facilitate what Williams did.

On the day of his arrest, Landers and Williams were driving to the beach.  The gun was in his pocket, but when the police pulled them over, he put the gun under the front passenger seat.  Landers admitted that was not the first time he was arrested.  He had previously been arrested and convicted of crimes, including drug offenses and two counts of armed robbery.

IV.    *The Jury Verdict and Sentencing*

The jury found Landers guilty on all counts.  For the murder charge in count 1, the jury found the firearm allegations to be true.

Landers waived his right to a jury trial on his prior convictions and admitted two prior convictions of robbery from February 2010.  Landers also admitted an aggravating factor that his "prior convictions as an adult . . . [were] numerous or of increasing seriousness."  (Cal. Rules of Court, rule 4.421(b)(2).)

The trial court sentenced Landers to an indeterminate term of 100 years to life on count 1, consisting of 75 years to life under the Three Strikes law, plus a consecutive term of 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)); and a consecutive determinate term of six years, consisting of the upper term of six years on count 7, a concurrent upper term of three years on count 3, a stayed upper term of three years on count 4, and a stayed upper term of three years on count 5.  The trial court struck the enhancements as to counts 3, 4, 5, and 7 for sentencing purposes.[4]  The total state prison term was 106 years to life.  Landers timely appealed.

---

[4]    The trial court did not impose and appears to have struck terms for the remaining enhancements as to count 1— enhancements for having prior serious felony convictions (§ 667, subd. (a)(1)) and having served a prior prison term (§ 667.5, subd. (b)).  The enhancement for the prior prison term is now "legally invalid."  (§ 1172.75.)

16

## *DISCUSSION*

### I.    *The Evidence Was Sufficient to Establish Pimping*

Landers contends there was insufficient evidence to support his conviction for pimping (count 7) because there was no evidence he received financial support from Williams's prostitution.  Landers is incorrect.

#### A.    *Relevant Legal Principles*

"In assessing the sufficiency of the evidence, we review the entire record to determine whether any rational trier of fact could have found defendant guilty beyond a reasonable doubt. [Citation.]  'The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'  [Citation.]  In applying this test, we review the evidence in the light most favorable to the verdict and presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence . . . .  [W]e may not reverse for insufficient evidence unless it appears ' "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' "  (*People v. Valenti* (2016) 243 Cal.App.4th 1140, 1157, superseded in part by statute on other grounds as stated in *People v. Villegas* (2023) 97 Cal.App.5th 253, 281, fn. 9, review granted Jan. 31, 2024, S283126, review dism. May 15, 2024.)

"Even where, as here, the evidence of guilt is largely circumstantial, our task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might reasonably be reconciled with the defendant's innocence. [Citations.]  It is the duty of the jury to acquit the defendant if it

17

finds the circumstantial evidence is susceptible to two interpretations, one of which suggests guilt and the other innocence. [Citation.] But the relevant inquiry on appeal is whether, in light of all the evidence, '*any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.' " (*People v. Zaragoza* (2016) 1 Cal.5th 21, 44.)

Section 266h, subdivision (a), provides: "[A]ny person who, knowing another person is a prostitute, lives or derives support or maintenance in whole or in part from the earnings or proceeds of the person's prostitution" is guilty of pimping. Accordingly, the prosecution had to prove that (1) Landers knew Williams was a prostitute, and (2) Landers derived support or maintenance, in whole or in part, from Williams's earnings as a prostitute. (*People v. Scally* (2015) 243 Cal.App.4th 285, 292 (*Scally*); accord, *People v. Grant* (2011) 195 Cal.App.4th 107, 112, 115; see CALCRIM No. 1150.)

"[D]eriving support with knowledge that the other person is a prostitute is all that is required for violating the section in this manner. No specific intent is required." (*People v. McNulty* (1988) 202 Cal.App.3d 624, 630.) It is not a defense that the proceeds from another person's prostitution were used to pay shared expenses. (*People v. Navarro* (1922) 60 Cal.App. 180, 182 ["It was not necessary to show that the money [the defendant] received from [the prostitute] was used solely to pay [the defendant's] own living expenses"].)

Pimping is a crime of a "continuous ongoing nature." (*People v. Leonard* (2014) 228 Cal.App.4th 465, 489, 491 (*Leonard*).) Thus, the evidence presented to establish the offense may take the form of "several discrete events" or may be "directed towards

18

a continuous course" of activity demonstrating pimping. (*Id.* at p. 492.)

B.    *Analysis*

Construing the circumstances of this case in the light most favorable to the verdict (*People v. Valenti, supra*, 243 Cal.App.4th at p. 1157), we find there is substantial evidence Landers derived support from Williams's prostitution. First, there was evidence that Landers and Williams shared living expenses over several months. They lived together at various places and spent all their time together. Around the time of the murder, Landers and Williams stayed at the Los Angeles Inn and Suites hotel. Surveillance video showed Williams at the hotel's front desk, from which it could be reasonably inferred she paid for the hotel room. (Cf. *People v. Navarro, supra*, 60 Cal.App. at p. 182 [evidence defendant lived with prostitute and paid their shared rent with earnings from the prostitution was sufficient to demonstrate defendant derived financial support from prostitution].)

Further, there was ample evidence Landers acted as Williams's pimp, in that he aided and controlled her prostitution. Landers carried a gun while with Williams and kept her ATM card. Based on Ineguez's testimony on the common practices of pimps, the jury could reasonably infer Landers carried the gun to protect Williams as his prostitute and kept Williams's ATM card to "manage [her] money." There is also evidence Landers used his cell phone to arrange Williams's dates. In addition, when it became obvious he would be arrested because the police had just located his gun while searching the Hyundai, Landers ordered Williams to "keep to the same program," stay on the "post," and "[d]on't be doing outcalls." From this evidence a jury could

19

reasonably infer Landers was heavily involved in Williams's prostitution: he provided protection, controlled her finances, arranged her communications, and provided instruction. A reasonable jury could also conclude Landers's involvement in Williams's prostitution was for his own financial gain. (See *Scally, supra,* 243 Cal.App.4th at p. 293 ["jury could conclude that, as a matter of common sense, when defendant was instructing [the prostitute] to meet certain quotas, he was doing so for his own gain"].)

Moreover, there is evidence Landers identified as a pimp. Landers had a tattoo of the Monopoly game character "Top Hat," which is common among a "majority" of pimps and signifies "they're all about money, getting money, were out for money, trying to get paid." Landers also had a tattoo that said, "Tiny Loc Pimp," which means "Tiny Crazy Pimp." This evidence supports the conclusion Landers was not merely an innocent bystander to Williams's prostitution but rather was "deliberately acting the part of the pimp." (See *Scally, supra,* 243 Cal.App.4th at pp. 292-293 [defendant's text messages where he was "using pimp terminology, bragging about the money he was making, recruiting, exhibiting knowledge of high prostitution areas, and scheduling his work around prostitution" showed he was "steeped in the pimping culture" and "was deliberately acting the part of the pimp," "thus undermining the claim [he] was merely an innocent bystander"].) Even if, as Landers argues, he got the tattoo "long before the charges in this case," this possibility does not compel reversal. (See *People v. Meza* (1995) 38 Cal.App.4th 1741, 1747 ["Where the circumstances support the trier of fact's finding of guilt, an appellate court cannot reverse merely because it believes the evidence is reasonably reconciled with the

20

defendant's innocence"].) Nor does Landers challenge the admissibility of the evidence of his tattoos on appeal. Combined with the facts above, this evidence supports a reasonable inference that Landers was involved in Williams's prostitution and, when they lived together, Landers derived support from her prostitution. (See *People v. Bean* (1988) 46 Cal.3d 919, 933 [" 'Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt' "].) We therefore find substantial evidence supported his conviction for pimping.

II.     *The Court's Alleged Error in Denying Landers's Section 995 Motion Is Moot*

Landers contends the trial court should have granted his section 995 motion to dismiss the pimping count because there was insufficient evidence of pimping presented at the preliminary hearing. This issue is moot.

An erroneous denial of a section 995 motion justifies reversal of a judgment of conviction only if a defendant can "demonstrate prejudice at trial flowing from the purportedly inadequate evidentiary showing at the preliminary hearing." (*People v. Crittenden* (1994) 9 Cal.4th 83, 137.) Landers has not done so here. "Where the evidence produced at trial amply supports the jury's finding, any question whether the evidence produced at the preliminary hearing supported the finding of probable cause is rendered moot. Even ' " '[i]f there is insufficient evidence to support the commitment, the defendant cannot be said to be prejudiced where sufficient evidence has been introduced at . . . trial' " ' to support the jury's finding as to the charge or as to the truth of the allegation." (*Ibid*.) Because, as

21

discussed, the evidence at trial was sufficient to support the pimping conviction, Landers's contention is without merit.

III. *The Court Did Not Err in Denying Landers's Motion To Sever the Pimping Charge from the Murder Charge*

Landers contends the trial court erred when it denied his motion to sever the pimping charge from the murder charge. He also asserts a joint trial on the charges deprived him of his constitutional right to a fair trial and due process. We disagree.

A. *Procedural and Factual Background*

(1) *Motion to Consolidate*

The People originally charged Landers with two separate cases—one arising out of the March 2019 murder, and the other arising out of his April 2019 arrest in Manhattan Beach. Before the preliminary hearing, the People filed a motion to consolidate both cases.

At the hearing on the motion to consolidate, the court stated it was inclined to grant the motion because "[t]he cases are inexplicably bound up together, the facts relate to one another, and the witnesses will likely overlap." Defense counsel argued the pimping charge had nothing to do with the murder charge, was a weak case, and had "the potential of affecting the case negatively." The court granted the motion to consolidate, reasoning regardless of whether the evidence for the pimping charge was weak or strong, the danger of prejudice was minimal.

(2) *Motion to Sever*

Before trial, defense counsel filed a motion to sever the pimping charge from the murder charge. Counsel argued the charges involved distinct expert witnesses, the murder charge

22

was inflammatory, the pimping charge was weak, and joinder would prejudice Landers.  In response, the People argued that under Los Angeles Superior Court Local Rules, rule 8.6(d), the court had no authority to sever the pimping charge because the matter had already been litigated when the People filed their motion to consolidate.  Alternatively, the People argued Landers was not prejudiced by the joinder.

At the hearing on the severance motion, the court said it was not convinced it had jurisdiction to rule on the motion to sever because the joinder issue had been previously litigated before another bench officer.  However, the court continued, even if it had jurisdiction, it would not sever the pimping charge.  The court reasoned none of the charges was more inflammatory than the other, some evidence was cross-admissible, and no undue prejudice would result from trying the charges together.  Thus, the court denied the motion.[5]

B.  *Analysis*

Section 954 authorizes joinder of different offenses when they are "connected together in their commission or . . . [are] of the same class of crime or offenses."  Joinder "is intended to promote judicial efficiency." (*People v. Landry* (2016) 2 Cal.5th 52, 75 (*Landry*).)  "[J]oinder 'is the course of action preferred by the law.'" (*People v. Westerfield* (2019) 6 Cal.5th 632, 689 (*Westerfield*).)  Nonetheless, the trial court has discretion to sever

---

[5]     The People contend we should affirm the denial of the motion to sever on the grounds it was not timely and was barred under Los Angeles Superior Court Local Rules, rule 8.6(d).  Because we affirm the denial of the motion to sever on the merits, we need not address these procedural grounds.

counts "in the interest of justice and for good cause shown." (§ 954; see *Westerfield*, at p. 689.)

" 'When exercising its discretion, the court must balance the potential prejudice of joinder against the state's strong interest in the efficiency of a joint trial.' [Citation.] To successfully claim that the trial court abused its discretion in denying a motion to sever, a ' " 'defendant must make a clear showing of prejudice' " ' by demonstrating that the denial 'exceeded the bounds of reason.' " (*Westerfield*, *supra*, 6 Cal.5th at p. 689.) We review the denial of a motion to sever for abuse of discretion. (*People v. Vargas* (2020) 9 Cal.5th 793, 817.)

### (1) *The Counts Were Connected in Their Commission*

Joinder of the murder and the pimping offenses was permissible because the offenses were "connected together in their commission." (§ 954.) Offenses committed at different times and places against different victims are nevertheless " 'connected together in their commission' " if they are linked by a " 'common element of substantial importance.' " (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1219 (*Alcala*).)

The murder and pimping offenses were linked by multiple common elements of substantial importance: a shared witness and shared physical evidence. (See *People v. Lucky* (1988) 45 Cal.3d 259, 276 [offenses were connected together in their commission because "the facts underlying the joined offense share certain characteristics"].) Williams was a primary witness to both offenses. Both offenses involved the same gray Hyundai; Landers used the Hyundai as a getaway car in the murder and as a means of conducting business for pimping. Indeed, Landers's association with the gray Hyundai from his Manhattan Beach

24

arrest helped Detective Rose connect Landers to the murder. Moreover, Landers used the same gun in both offenses—to shoot Toca and to protect and/or intimidate Williams when he acted as her pimp. (See *Landry*, *supra*, 2 Cal.5th at p. 76 ["the common thread among all four offenses is the use or possession by defendant of a prison-made stabbing weapon"].) The gun was recovered in the course of Landers' arrest on the pimping charge. Thus, joinder was proper because a joint trial would conserve judicial resources by ensuring there was no need to recall the same witnesses in two separate proceedings. (See *People v. Soper* (2009) 45 Cal.4th 759, 722 (*Soper*); see *Alcala*, *supra*, 43 Cal.4th at p. 1217 [the language "connected together in their commission" in section 954 reflects a legislative intent for a "very broad test for joinder"].)

(2)      *Any Prejudice from Trying the Charges*
         *Together Did Not Outweigh the Efficiencies*

"Where joinder is proper under section 954, '[t]he burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' " (*People v. Gomez* (2018) 6 Cal.5th 243, 275.) " 'In determining whether a trial court's refusal to sever charges amounts to an abuse of discretion, we consider four factors: (1) whether evidence of the crimes to be jointly tried is cross-admissible; (2) whether some charges are unusually likely to inflame the jury against the defendant; (3) whether a weak case has been joined with a stronger case so that the spillover effect of aggregate evidence might alter the outcome of some or all of the charges; and (4) whether any charge carries the death penalty or the joinder of charges converts the matter into a capital case.' [Citation.] 'We then balance the potential for prejudice to the

25

defendant from a joint trial against the countervailing benefits to the state.' [Citation.] However, '[i]f the evidence underlying the joined charges would have been cross-admissible at hypothetical separate trials, "that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges." ' " (*Westerfield*, *supra*, 6 Cal.5th at p. 689.)

"We first consider whether evidence of each of the offenses would be cross-admissible in 'hypothetical separate trials.' " (*People v. Armstrong* (2016) 1 Cal.5th 432, 456.) Typically, we "determine whether evidence on each of the joined charges would have been admissible, under Evidence Code section 1101[6], in separate trials on the others." (*People v. Balderas* (1985) 41 Cal.3d 144, 171-172, superseded by statute on other grounds as stated in *People v. Martin* (1998) 64 Cal.App.4th 378, 385.)

---

[6] Evidence Code section 1101 provides: "(a) . . . [E]vidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act. [¶] (c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

Landers contends there was no cross-admissibility of evidence in hypothetical separate trials. Although most of the evidence underlying either offense is *not* cross-admissible for any of the purposes under Evidence Code section 1101, such as motive, intent, or identity, one significant piece of evidence was cross-admissible. The gun found under the Hyundai's front passenger seat that Landers used to protect Williams as his prostitute was also used in the murder. By inference, this evidence showed Landers was also involved in the murder. (See *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 282 ["As to the first factor, one very significant piece of evidence was cross-admissible. A live nine-millimeter round found in the getaway van used in the . . . robbery murder showed the same magazine markings as the expended shells found at the scene of the [separate] murders. This evidence showed that the same gun, and thus inferentially its bearer, was present at both of the murders"].) Nonetheless, because cross-admissibility exists here to only a limited extent, it is not sufficient, standing alone, to dispel any potential prejudice. (See *ibid.*)

Landers contends joinder was prejudicial because the pimping count was weaker than the murder count. However, while the pimping evidence was circumstantial and may have been *relatively* weaker, it was sufficiently compelling on its own. Williams and Landers were pulled over at 3:00 a.m. Williams admitted she was a prostitute and had a knife in the car for protection from other prostitutes. In the car were condoms, women's lingerie, and a phone flashing multiple text messages from a common dating application. Landers had a loaded gun under his seat, and he was holding Williams's identification and ATM cards. He had a "Broke Bitch Killa" neck tattoo, which an

expert testified signified "that girls he's putting on the street, in terms, better not be out of pocket," and "when they return back after a night's work, they better have money or they're going to suffer consequences."[7] Together, the circumstantial evidence, even if weaker than the murder evidence, demonstrated Landers was controlling Williams's prostitution for financial benefit. (See *Soper*, *supra*, 45 Cal.4th at p. 781 ["[A]s between any two charges, it always is possible to point to individual aspects of one case and argue that one is stronger than the other. A mere imbalance in the evidence, however, will not indicate a risk of prejudicial 'spillover effect,' militating against the benefits of joinder and warranting severance of properly joined charges"].) And even if the pimping case were materially weaker overall, that one factor alone is not dispositive.

Landers also argues *both* counts were likely to inflame the jury with a "spillover effect of [] prejudice travel[ling] in both directions." Plainly the murder count was more inflammatory than the pimping count because it resulted in a death (see *People v. Trujeque* (2015) 61 Cal.4th 227, 260 [concluding charge not involving bodily injury less inflammatory]), but "the animating concern underlying this factor is not merely whether evidence

---

[7] We review a trial court's decision not to sever based on the record when the motion was heard (*Westerfield*, *supra*, 6 Cal.5th at p. 689; *People v. Elliot* (2012) 53 Cal.4th 535, 552), so here the relevant facts were primarily those introduced at the preliminary hearing. The evidence adduced then was similar to that introduced at the trial, except at the preliminary hearing the People did not introduce the evidence from the hotel surveillance or the recorded statements of Landers and Williams while in the back of the patrol car.

from one offense is repulsive, because repulsion alone does not necessarily engender undue prejudice. [Citation.] Rather, the issue is 'whether " 'strong evidence of a *lesser* but inflammatory crime might be used to bolster a weak prosecution case' on another crime." ' " (*People v. Simon* (2016) 1 Cal.5th 98, 124, italics added, citing *People v. Capistrano* (2014) 59 Cal.4th 830, 850, overruled on other grounds in *People v. Hardy* (2018) 5 Cal.5th 56, 104.) Here, the evidence from the murder count, while undoubtedly disturbing, was not unduly prejudicial given that the pimping count "was no more serious an offense and was also supported by strong evidence." (*Simon*, at p. 125 [joinder of inflammatory murders involving rape against teenagers with less-inflammatory gang-related murder was not prejudicial because the inflammatory murders "cannot be characterized as the 'lesser' crimes" and the less-inflammatory gang-related murder was supported by strong evidence].)[8]

The benefits of joinder here were substantial and not outweighed by the possible prejudice. (*Soper*, *supra*, 45 Cal.4th at p. 781.) In the event of separate trials, there would have been overlap of several matters. As discussed, the same gun and car were pieces of evidence in both cases. The primary eyewitness to the murder, Williams, was also an important witness to the pimping count. Further, "as a general matter, a single trial of properly joined charges promotes important systemic economies. Whenever properly joined charges are severed, the burden on the public court system of processing the charges is substantially increased." (*Id.* at p. 782.) Landers has failed to carry his burden

---

8 The final factor, "whether any charge carries the death penalty" (*Westerfield*, *supra*, 6 Cal.5th at p. 689), does not apply because Landers's case is not a capital one.

to demonstrate a "clear showing of prejudice," and thus we find no abuse of discretion in the denial of the motion to sever. (*Alcala, supra*, 43 Cal.4th at p. 1229.)

### (3) *There Was No Due Process Violation*

Furthermore, "upon reviewing 'events *after* the court's ruling,' we do not find that 'joinder actually resulted in "gross unfairness" amounting to a denial of [Landers's] constitutional right to fair trial or due process of law.' " *People v. Gomez, supra*, 6 Cal.5th at p. 277.) Landers bears the "high burden" of making that showing. (*Soper, supra*, 45 Cal.4th at p. 783.) There is no due process violation where the evidence of each crime is "straightforward and distinct" and "independently ample" to support a defendant's conviction of both crimes. (*Id.* at p. 784.)

As discussed, the evidence at trial of pimping was sufficient and straightforward, consisting of Ineguez's testimony, Williams's testimony, and surveillance video. It was also distinct from the evidence in the murder case, so there was no danger that the jury would not be able to "compartmentalize" the evidence supporting each case. (*Soper, supra*, 45 Cal.4th at p. 784.)

The evidence in the murder case was likewise straightforward and overwhelming. Landers had a clear motive to shoot Toca. He was angry with Toca for slashing Williams's tire and texted Williams that he intended to "dead" Toca for disrespecting him. There were several witness identifications. Williams testified she saw Landers shoot Toca multiple times. Several other witnesses, including Robinson, Williams's passenger, corroborated Williams's identification of Landers as the shooter. Surveillance video from the crime scene, which showed a man resembling Landers walk away from the alley

30

where the shooting took place, further corroborated Williams's account.  Lastly, Landers's gun was used to kill Toca.  Although Landers testified Williams was the actual shooter, given the ample evidence supporting Landers as the shooter, the jury could reasonably disregard Landers's version of events.

In addition to hearing ample evidence of each crime, the jury was instructed with CALCRIM No. 3515, which stated, "Each of the counts charged in this case is a separate crime.  You must consider each count separately and return a separate verdict for each one."  This instruction "mitigated the risk of any prejudicial spillover."  (*Soper, supra*, 45 Cal.4th at p. 784.)  Landers's trial was not grossly unfair.

IV.    *Any Error in Admitting Opinion Testimony Was Harmless*

Landers claims the trial court erred by impermissibly allowing Ineguez to express his opinion on Landers's guilt as to the pimping charge and on whether Williams was telling the truth when she denied Landers was her pimp.  Landers further contends the improper opinion testimony rendered the trial fundamentally unfair under the due process clause.  We conclude any error was harmless.

During Ineguez's trial testimony, the following exchange occurred:

> [The prosecutor]:  Would – in your training and experience, would it be common or uncommon for a woman who is working as a prostitute to deny having a pimp?
>
> [Ineguez]:  Yes.

31

[The prosecutor]:  How?

[Ineguez]:  By saying that they're working rogue would be the term that they would use.

[The prosecutor]:  And did you – why would they say that?

[Ineguez]:  To avoid getting their pimp in trouble.

The Court:  I don't know what the relevance of this is. Let's move on now to this case, please.

Later in Ineguez's testimony, the following exchange occurred:

[The prosecutor]:  And what else signal[]ed to you that you had something more than just a traffic stop on your hands here?

[Ineguez]:  Based on my training and experience in my work that I conducted on Santa Ana Boulevard, I formed the opinion at that time that there was pimping and pandering related crimes going on here.

[The prosecutor]:  That these – this was consistent with?

[Ineguez]:  Yes.

[The prosecutor]: How so?

[Ineguez]: The fact that he was – there was a firearm readily accessible to him, which is not uncommon for pimps. Pimps will usually carry some sort of weapon for protection of either themselves or the prostitute that they're with. [¶] The fact that there was the women's lingerie clothing in the backseat, the condoms, again, the fact that she had outstanding warrants and self admitted to being a prostitute. [¶] And most importantly, the messages that were coming through on the cellphone, that was cellphone later determined to be [Landers's]. So. [¶] I formed the opinion based on that, that he was escorting her around or accompanying her while she was meeting individuals on these dates.

[Defense counsel]: I'm going to object to that as an improper conclusion and move to strike.

The Court: I'm going to overrule it as the way he phrased it. [¶] Go ahead.

An expert witness's testimony "in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including [the expert's] special knowledge, skill, experience, training, and education) . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the

33

subject to which his testimony relates." (Evid. Code, § 801.) The culture of pimping and prostitution is sufficiently beyond common experience that the opinion of an expert on the subject is deemed helpful to the trier of fact. (*Leonard, supra,* 228 Cal.App.4th at pp. 492-493.)

An expert's opinion "is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (Evid. Code, § 805.) An expert may also express opinions based on hypothetical questions that track the evidence in the case. (*People v. Vang* (2011) 52 Cal.4th 1038, 1048 (*Vang*).) However, "[a]n expert witness may not give an opinion as to whether another witness is telling the truth, or whether the defendant is guilty." (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 176 (*Lapenias*); accord, *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 81-83.) The reason for this rule is that impermissible opinion testimony is of " ' "no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt." ' " (*Vang*, at p 1048; accord, *People v. Duong* (2020) 10 Cal.5th 36, 60.) "We review the trial court's decision to admit expert testimony for abuse of discretion." (*Leonard, supra*, 228 Cal.App.4th at p. 493.)

Landers contends the trial court erred when it allowed Ineguez to testify to his opinions "there was pimping and pandering related crimes going on here" and "[Landers] was escorting [Williams] around or accompanying her while she was meeting individuals on these dates." That testimony, Landers argues, impermissibly opined on Landers's guilt. Landers also contends the court should not have allowed Ineguez to testify about Williams's credibility by answering "[y]es" to the

34

prosecutor's question whether it would "be common or uncommon for a woman who is working as a prostitute to deny having a pimp."

Landers only objected to Ineguez's statement that he formed the opinion "that [Landers] was escorting [Williams] around or accompanying her while she was meeting individuals on these dates." Thus, his other claims of error are forfeited on appeal.[9] (See *People v. Garlinger* (2016) 247 Cal.App.4th 1185, 1193 [defendant did not object to expert testimony, forfeiting the contention on appeal that the testimony was inadmissible].)

However, even assuming Landers did not forfeit his other claims of error and Ineguez's challenged statements were improper, any error was harmless. " 'The erroneous admission of expert testimony only warrants reversal if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*Lapenias*, *supra*, 67 Cal.App.5th at pp. 176-177.) We see no reasonable probability Landers would have achieved a more favorable result in the absence of the challenged testimony. The testimony cited by Landers was brief. Neither defense counsel nor the People mentioned it during closing arguments. (See *id.* at p. 180 [expert's improper opinion testimony was harmless in part because testimony was brief, as were mentions of the testimony by both counsel during closing].) The remaining evidence against Landers on the pimping charge was ample, as discussed.

---

[9] Landers asserts that an objection would have been futile, but we find no support for that assertion.

Moreover, the trial court instructed the jury with CALCRIM Nos. 226 and 332, which told the jury they were the sole judge of the credibility of the witnesses and they were not required to accept Ineguez's testimony as true. (See CALCRIM No. 226 ["You alone must judge the credibility or believability of the witnesses"]; CALCRIM No. 332 ["You must consider the [expert] opinions, but you are not required to accept them as true or correct. The meaning and importance of any opinion are for you to decide"].) "We presume the jurors understood and followed the instructions." (*Lapenias*, *supra*, 67 Cal.App.5th at p. 180; see *People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 83 [expert's improper opinion testimony was harmless in part because court instructed jury that it was not bound by expert's opinion].) Landers has not established prejudicial error.[10]

V.  *The Court's Admission of the Entire* Perkins *Operation Was Erroneous but Harmless*

Landers contends the trial court erred in admitting the recording of the *Perkins* operation as a prior consistent statement under Evidence Code section 791 and the error deprived him of due process of law. We agree with Landers in part. The court should not have admitted the *entire* recording as a prior consistent statement. However, the error was harmless.

---

[10]  We also reject Landers's contention that the admission of Ineguez's testimony violated the due process clause. "Application of the ordinary rules of evidence generally does not impermissibly infringe on a . . . defendant's constitutional rights. [Citation.] [Landers] fails to persuade us this case constitutes an exception to that general rule." (*People v. Kraft* (2000) 23 Cal.4th 978, 1035-1036; accord, *People v. Prince* (2007) 40 Cal.4th 1179, 1229.)

36

A.   *Factual Background*

During Williams's cross-examination, defense counsel asked her several questions about her interactions with the detectives while in custody on a warrant for murder. Defense counsel asked, "[B]efore you gave a statement to the detectives, one of the things Detective Mendoza told you was 'Straight up it's you or him.' Right?" Williams responded, "Yes," and agreed with defense counsel that she understood Mendoza's question "to mean that the detectives were either going to go after [her], or they were going to go after Mr. Landers."

Later in the trial, during cross-examination of Mendoza, defense counsel asked about the interview methods Mendoza used with Williams. Counsel asked Mendoza if he threatened Williams or implied she "should put the blame on someone." After Mendoza denied doing so, defense counsel asked if Mendoza considered the statement "it's either you or him" a threat or an attempt to place blame. Mendoza again answered in the negative. Then, defense counsel asked Mendoza if he told Williams before the interview, "Straight up, it's either you or him." Mendoza denied making that statement to Williams.

At that point, defense counsel attempted to play the portion of the *Perkins* operation where Mendoza told Williams, "it's you or him." The prosecutor requested a sidebar, and the jury was excused. The prosecutor and defense counsel discovered their transcripts of the *Perkins* operation were slightly different. Defense counsel's transcript showed Mendoza saying, "it's you or him," while the prosecutor's transcript said "it's you and him." The court concluded the jury would decide what was said.

The parties also discussed whether other statements during the *Perkins* operation, besides Mendoza's statement, were

37

admissible. Defense counsel argued Williams's statement, "It's gonna be him. I'm not going down for this shit," made shortly after Mendoza's "it's you or him" statement, was relevant. The prosecutor responded the entire *Perkins* operation was relevant, and the trial court agreed. The court articulated, and defense counsel agreed, that the defense wished to introduce Mendoza's statement "it's you or him" to suggest the statement motivated Williams to lie and "save herself" by pointing the finger at Landers. The court ruled such an implied charge of a motive made the entire *Perkins* operation admissible as a prior consistent statement. Defense counsel objected to playing the entire *Perkins* operation because Williams's "motive [to lie] existed from the moment [she was] arrested."

When Mendoza returned to the stand for cross-examination, defense counsel played the following portion of the *Perkins* operation:

Detective Mendoza: My partner just got here.

Williams: Okay.

Detective: All right? Listen, straight up, it's you or him.

Williams: I understand.

Detective: Listen, we see him get in the car, in your car. We see you back up, wearing the bandana. I mean, it's you or him. It's just no joke. We see you go around the block. You feel me?

Williams:  Mm-hmm.  I understand.

Detective:  Okay, I'll be right back, okay?  He's here.

Williams:  Okay.

During redirect, the prosecutor played the entire recording of the *Perkins* operation.

During the *Perkins* operation, Williams initially denied knowing anything about the murder.  However, after Mendoza told Williams, "Miss Toca is dead," and "I'm gonna show you some stuff that's gonna blow your mind," Williams suggested to her cellmate that Landers "probably" killed Toca.  When her cellmate asked, "You think he got her?," Williams responded, "I hope didn't do that.  He, probably, did."  Williams then said, "I didn't fucking do nothing. . . [I]f he did do that shit to that girl, that's not my problem.  I – I  didn't do nothing. . . .  I'm not about to take this shit for him neither . . . cause I didn't do that. . . .  I'm not taking no hits for nobody. . . .  [H]e, probably, did it when I – I took him to the bike shop. . . ."

After Mendoza told Williams, "We see you back up, wearing the bandana.  I mean, it's you or him," Williams continued to deny involvement in the murder.  Williams said to her cellmate, "It's gonna be him.  I'm not going down for this shit. . . .  I'm not gonna take no mother-fucking case. . . .  I'm not going down for this, 'cause I didn't do nothing.  I didn't do nothing.  I did not do nothing.  All I was told was to come and get this boy. . . .  I'm not going down for it. . . .  I'm not going down for it."

B.    *Relevant Legal Principles*

"Hearsay is an out-of-court statement offered to prove the truth of its content."  (*People v. Valencia* (2021) 11 Cal.5th 818, 831; see Evid. Code, § 1200, subd. (a).)  Any out-of-court statement made by a testifying witness, offered to prove the truth of the matter asserted, is inadmissible hearsay unless it meets one of the recognized exceptions.  (Evid. Code, § 1200, subds. (a) & (b); *People v. Alvarez* (1996) 14 Cal.4th 155, 185.)  Evidence Code sections 1236 and 791 set forth the exception for a testifying witness's prior consistent statements.

Evidence Code section 1236 provides:  "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his testimony at the hearing and is offered in compliance with Section 791."

Evidence Code section 791 provides:  "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after:  []  (a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement; or  [¶]  (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

We review a trial court's evidentiary rulings for an abuse of discretion.  (*People v. Grimes* (2016) 1 Cal.5th 698, 711.)  Error in admitting hearsay is reviewed under the harmless error standard

40

of *People v. Watson* (1956) 46 Cal.2d 818.  (*People v. Duarte* (2000) 24 Cal.4th 603, 618-619.)

C.    *Analysis*

The People argue the entire *Perkins* operation was admissible under both subdivisions (a) and (b) of Evidence Code section 791.  Starting with subdivision (a), the People argue Williams's prior statements were properly admitted because her statement to Mendoza, "It's gonna be him.  I'm not going down for this shit," was inconsistent with her trial testimony.  However, although defense counsel contemplated playing that statement by Williams for the jury, he ultimately did not.  Instead, defense counsel played a portion of the *Perkins* operation that included only Williams's statements of "Okay" and "I understand."  Under subdivision (a), a witness's prior consistent statement is admissible only if the witness's inconsistent statement "*has been admitted*" and the prior consistent statement was made before the inconsistent statement.  (Evid. Code, § 791, subd. (a), italics added.)  Without any inconsistent statement by Williams, subdivision (a) did not apply.

Turning to subdivision (b), Landers does not contest that defense counsel made an implied charge of fabrication during Williams's and Mendoza's trial testimony.  As the trial court correctly noted, defense counsel's questions to Williams and Mendoza regarding Mendoza's use of the words "it's you or him" created an implied charge that Mendoza's words improperly motivated Williams to lie and "save herself."  (See *People v. Bunyard* (1988) 45 Cal.3d 1189, 1209 ["The mere asking of questions may raise an implied charge of improper motive"], abrogated on other grounds in *People v. Diaz* (2015) 60 Cal.4th 1176, 1191.)  But Landers contends Williams's motive to fabricate

41

arose *before* Mendoza's "it's you or him" statement during the *Perkins* operation, because Williams already knew she was in jail in connection with the murder. Thus, Landers contends the *Perkins* operation was not admissible under subdivision (b) of Evidence Code section 791.

We reject Landers's contentions, for the most part. It is possible for a case to include more than one event leading to a motive to fabricate. (*People v. Jones* (2003) 30 Cal.4th 1084, 1106-1107.) In cases where there is more than one motive to lie, the prior consistent statement is admissible if it was made before "the existence of *any one or more* of the biases or motives that, according to the opposing party's express or implied charge, may have influenced the witness's testimony." (*People v. Hayes* (1990) 52 Cal.3d 577, 609, italics added; accord, *Jones*, at pp. 1106-1107 [witness's prior statement to police before entering into plea bargain was admissible even though witness had an additional motive to lie when first contacted by police].) While a witness may have a "motive to minimize potential penal liability" as soon as the witness is arrested for the crime, "the focus under Evidence Code section 791 is the specific agreement or other inducement suggested by cross-examination as supporting the witness's improper motive." (*People v. Noguera* (1992) 4 Cal.4th 599, 630.) Thus, Williams's prior consistent statements were admissible so long as they were made before "*any one or more* of the biases or motives" arose. (*Hayes*, at p. 609, italics added.) Even though Williams may already have had a motive to lie because she knew she had been arrested in connection with a murder, under the defense's theory an additional motive to fabricate arose when Mendoza told her "it's you or him."

42

Therefore, the court properly admitted Williams's statements made prior to Mendoza's statement.

Only some of Williams's statements in the *Perkins* operation were made before that juncture, however. Williams's statements to her cellmate made *after* Mendoza's "it's you or him" statement were not admissible under Evidence Code section 791, subdivision (b). (See *People v. Jones*, *supra*, 30 Cal.4th at p. 1007.) Therefore, the court abused its discretion when it admitted the entire *Perkins* operation, which included Williams's subsequent statements.

But admission of Williams's subsequent statements during the *Perkins* operation was harmless. Mendoza's statement "it's you or him" came towards the very end of the *Perkins* operation. Thus, Williams's subsequent statements made up only a small portion of the *Perkins* recording. (Cf. *People v. Penunuri* (2018) 5 Cal.5th 126, 166 [erroneously admitted testimony held harmless where the witnesses' statements were "brief" and "a small part of the prosecution's case"]; *People v. Sully* (1991) 53 Cal.3d 1195, 1242 [allegedly improper evidence "represented but a small portion of the information received by the jury"].) More importantly, Williams's subsequent statements were substantially the same as her statements before Mendoza's words "it's you or him." Before Mendoza told Williams "it's you or him," Williams told her cellmate that she did not do anything, that she refused to take the blame, and that Landers "probably" killed Toca. After Mendoza's warning, Williams continued to say that she did not do anything. In that sense, Williams's subsequent statements were merely cumulative of her prior admissible statements. (Cf. *People v. Farnam* (2002) 28 Cal.4th 107, 158-159 [any error in admitting prior consistent statement was harmless

43

because it "merely corroborated other testimony at trial"].) Thus, had Williams's subsequent statements been excluded, it is not reasonably probable that Landers would have secured a more favorable result.[11] (See *People v. Johnson* (2022) 12 Cal.5th 544, 611 (*Johnson*).)

VI.  *Any Error in Admitting "Bad Character" Evidence About Landers Was Harmless*

Landers contends portions of Mendoza and Rose's interview of Williams contained improper evidence of Landers's "bad character and uncharged conduct" that was inadmissible under Evidence Code sections 1101 and 352.

The complained-of prosecution evidence followed the cross-examination of Williams. Defense counsel, seeking to discredit Williams, had impliedly charged that the detectives coerced Williams into accusing Landers of shooting Toca. The prosecution sought to admit Williams's entire interview with Mendoza and Rosa to rebut that implication. The trial court concluded only the introductory part[12] of the interview was relevant for that purpose. Defense counsel objected that a "whole section" of the introductory part of the interview was "highly prejudicial under [Evidence Code section] 352." In particular, one

---

[11]    Nor were Landers's due process rights violated by admission of the evidence. His due process claim is "without merit for the same reasons that [his] state law claim[]" is without merit. (*People v. Prince, supra*, 40 Cal.4th at p. 1229.)

[12]    The court referred to the introductory part as "introductory statements, background questions, and then more introductory statements by the detective prior to getting into the substance of the interview."

44

of the detectives said, in reference to Landers, "he's a bad dude," "[h]e's a bad guy," and he had "a lot of, uh, arrests and stuff like that." The detective also told Williams, "[Y]ou're seen as a victim" who is "forced to do things." After the court concluded the evidence was not "so prejudicial", the prosecution played these statements as well as Rose's statement, "And these dudes they manipulate women, they do bad things, they tell you they love you or whatever and then you find out that they're with some other women or doing all sorts of nasty things, and you're trying to take care of them." Landers did not specifically object to this last statement.

Evidence of "a person's character or trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) "Evidence Code section 1101, subdivision (a) sets forth the 'strongly entrenched' rule that propensity evidence is not admissible to prove a defendant's conduct on a specific occasion." (*People v. Jackson* (2016) 1 Cal.5th 269, 299.) This prohibition does not apply to evidence "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity . . .) other than [a defendant's] disposition to commit such an act." (Evid. Code, § 1101, subd. (b).) Nor does this prohibition affect "the admissibility of evidence offered to support or attack the credibility of a witness." (Evid. Code, § 1101, subd. (c).)

Under Evidence Code section 352, the court must determine whether the probative value of evidence is substantially outweighed by the probability that its admission

would create substantial danger of undue prejudice, confusing the issues, or misleading the jury.  (Evid. Code, § 352; *People v. Ewoldt* (1994) 7 Cal.4th 380, 404, superseded by statute on other grounds as stated in *People v. Robertson* (2012) 208 Cal.App.4th 965, 991.)  The trial court "enjoys broad discretion" in engaging in this balancing test, and its ruling will not be disturbed on appeal absent an abuse of discretion.  (*People v. Lewis* (2001) 26 Cal.4th 334, 374.)

Landers acknowledges he did not preserve objections under Evidence Code section 1101 by failing to object on that basis. (See *People v. Pineda* (2022) 13 Cal.5th 186, 236 [objection under Evidence Code section 352 did not preserve claim of evidentiary error under Evidence Code section 1101].)  But he did object under Evidence Code section 352 to the bulk of the statements by the detectives that he contends were improperly admitted.

Even if the court erred in admitting the detectives' statements, the error was harmless.  In general, "the application of ordinary rules of evidence like Evidence Code section 352 does not implicate the federal Constitution, and thus we review allegations of error under the 'reasonable probability' standard of *Watson*."  (*People v. Marks* (2003) 31 Cal.4th 197, 227.)  Any error in admitting "prior bad acts" evidence under Evidence Code section 1101 would be reviewed under the same standard.  (See *Johnson*, *supra*, 12 Cal.5th 544, 611.)

It is not reasonably probable a result more favorable to Landers would have been reached absent the bad character evidence about Landers.  (*Johnson*, *supra*, 12 Cal.5th at p. 611.) The detectives' statements that Landers was a "bad dude" with "arrests" who "forced" and "manipulate[d] women" was brief.  The prosecutor did not mention the detectives' statements at any

point during closing argument. And the fact that the detectives stated Landers had prior "arrests" could not have materially affected the verdict given Landers provided that evidence himself when he testified he had previously been arrested and convicted of crimes, including drug offenses and two counts of armed robbery. Moreover, as discussed, there was overwhelming evidence of Landers's guilt. (See *People v. Doolin* (2009) 45 Cal.4th 390, 439 [any error in admitting bad character evidence was harmless because "[t]here was overwhelming evidence of defendant's guilt"]; *People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1120 [error in admitting propensity evidence was not prejudicial because "[t]he People's case was very strong"].)

Further, the court, on its own motion, provided an instruction on the limited purpose of the detectives' statements at the time they were admitted into evidence. The court stated, "[T]he statements of the detectives in regards to the interview are not admitted for the truth of the matter asserted. Okay? The only relevance of those statements are for you to evaluate what impact they may have had on the witness and what she subsequently said or didn't say." This limiting instruction, which we presume the jury followed, further diminishes the possibility of any prejudice from the admission of the detectives' statements casting aspersions on Landers. (See *People v. Chhoun* (2021) 11 Cal.5th 1, 30; *People v. Waidla* (2000) 22 Cal.4th 690, 725 ["The presumption is that limiting instructions are followed by the jury."].)

47

VII. *Landers Forfeited His Claim of Prosecutorial Misconduct and Cannot Establish Ineffective Assistance of Counsel*

Landers contends the prosecutor committed misconduct by questioning Landers about a statement Toca allegedly gave to the police in which she snitched on him, when the prosecution had no admissible evidence to prove Landers had knowledge of this. He argues this misconduct deprived him of due process and his Sixth Amendment right to confrontation. We conclude Landers forfeited the issue on appeal and failed to establish his attorney's failure to object was prejudicial.

A. *Background*

During trial, the prosecution filed a motion in limine asking the court to admit Toca's statements regarding an incident in Las Vegas that had resulted in gun and drug charges for Landers. The prosecution alleged Toca and Landers were staying at a house in Las Vegas when police officers raided the home under a search warrant. The officers found a gun and caught Landers flushing drugs down a toilet. Both Landers and Toca were arrested. Toca told officers the gun belonged to Landers and gave officers an estimation of the amount of drugs that were in the house. The prosecution's theory was that Landers knew Toca had cooperated with the police and that Toca's "snitching" provided another motive for Landers to kill her.

The court determined there was no admissible evidence that Landers *knew* Toca had cooperated. The court ruled the prosecution could question Landers to determine if what

48

happened in Las Vegas gave him a motive, but if Landers denied knowledge of the snitching, they would "go from there."[13]

During cross-examination of Landers, the prosecutor asked him if "the only reason" he was upset with Toca was because she had slashed Williams's car tire. Landers replied, "Yes." At this point, the cross-examination paused and the parties revisited the admissibility of the Las Vegas incident outside of the presence of the jury. Defense counsel argued that "what was happening in Las Vegas" should be excluded "because there's no foundation," and the court agreed. However, the court added that even if there was no independent evidence to prove motive, the prosecutor at least had "a good faith [basis] to ask the question."

Thereafter, the cross-examination of Landers resumed, and the following exchange took place:

[Prosecutor]: Sir, your ex friend's funeral, Ted, was in Los Angeles, not Vegas, correct?

[Landers]: Yes.

[Prosecutor]: But you were in Vegas in November 2018 with [Toca]. Right?

[Landers]: Yes.

---

[13] The court ruled under Evidence Code section 352 that the prosecution could not question Landers about the Las Vegas incident for purposes of impeaching him with prior bad acts.

49

[Prosecutor]:  And you got arrested with her out of her apartment in Las Vegas.  Right?

[Landers]:  Yes.

[Prosecutor]:  And she snitched on you during that arrest.  Right?

[Landers]:  No.

[Defense counsel]:  Objection: Calls for – no foundation as to –

The Court:  Well, overruled.  The question is whether he believes she snitched on him.  [¶]  Go ahead.

[Prosecutor]:  You have not had an opportunity to read Toca's statements to police.  Right?

[Landers]:  No.

[Prosecutor]:  And isn't that what really changed your relationship with Toca?

[Landers]:  No.

[Prosecutor]:  You – Toca disrespected you one too many times.  Isn't that right?

[Landers]:  No.

[Prosecutor]:  And that's why you were done with her?

[Landers]:  No.

[Prosecutor]:  And now that you've seen Reshay snitch on you, you're done with her, too.  Right?

[Landers]:  No.

B.    *Analysis*

Landers concedes the prosecutor was permitted to ask Landers if he knew Toca had "snitched" on him after they were arrested in Las Vegas.  However, after Landers denied knowing that, he contends the prosecutor's additional questions constituted misconduct because the prosecutor had no admissible evidence to prove the facts underlying the questions.

" ' "A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact." ' "  (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 657; accord, *People v. Hoyt* (2020) 8 Cal.5th 892, 943.)  It is improper for a prosecutor "to ask questions which clearly suggest[] the existence of facts which would [be] harmful to defendant, in the absence of a good faith belief by the prosecutor that the questions would be answered in the affirmative, or with a belief on his part that the facts could be proved, and a purpose to prove them, if their existence should be denied."  (*People v. Perez* (1962) 58 Cal.2d 229, 241, disapproved on other grounds in

51

*People v. Green* (1980) 27 Cal.3d 1, 32, 34; accord, *People v. Bolden* (2002) 29 Cal.4th 515, 562; *People v. Pitts* (1990) 223 Cal.App.3d 606, 734.)

We agree the prosecutor's additional questions were improper. By the time Landers testified, the prosecutor did not have a good faith belief she could offer independent evidence that Landers knew Toca had snitched. Thus, once Landers said he did not know about Toca snitching on him, the prosecutor should have ceased questioning on that topic. (See *People v. Perez*, *supra*, 58 Cal.2d at p. 241.)

Nonetheless, Landers forfeited his claim of prosecutorial misconduct by failing to object. " ' "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." ' " (*People v. Beck and Cruz*, *supra*, 8 Cal.5th at p. 657.) " 'The lack of a timely objection and request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm.' " (*Hoyt*, at pp. 942-943; accord, *People v. Powell* (2018) 6 Cal.5th 136, 171.)

Landers's trial counsel objected on foundation grounds to the prosecutor's first question about Toca snitching but did not make any further objections or request that the jury be admonished. Because Landers did not make any attempt to object to the prosecutor's additional questions on proper grounds, we cannot say that the lack of an objection would have been futile. While "there may be cases in which an objection and request for admonition would have been futile," there is no evidence here that the trial court "appear[ed] disposed to overrule

52

additional objections, and perhaps even to criticize defense counsel in front of the jury." (See *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 858.) Thus, we conclude the claim is forfeited on appeal. (See *People v. Bolden*, *supra*, 29 Cal.4th at p. 564 [holding argument was forfeited where "the defense did not object that the prosecutor was engaging in misconduct by implying facts the prosecutor was unable to prove"].)

Landers argues his attorney was ineffective for failing to object to the prosecutor's additional questions. To demonstrate ineffective assistance of counsel, Landers must show his trial counsel's performance fell below an objective standard of reasonableness, and that he was prejudiced by trial counsel's performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).)

"As [our Supreme Court has] noted repeatedly, the mere failure to object rarely rises to a level implicating one's constitutional right to effective legal counsel." (*People v. Boyette* (2002) 29 Cal.4th 381, 433.) "Moreover, '[i]f the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.' " (*People v. Huggins* (2006) 38 Cal.4th 175, 206.)

Furthermore, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." (*Strickland*, *supra*, 466 U.S. at p. 697; see *People v. King* (2010) 183 Cal.App.4th 1281, 1298 ["If [the defendant] cannot show prejudice, we may reject his claim of ineffective assistance, and need not address the adequacy of trial counsel's

performance."].)  The defendant "bears the burden of showing prejudice, that is, a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 676, quoting *Strickland*, at p. 694.)

Landers has not met this burden.  The prosecutor's questions were brief, and the prosecutor did not refer to the issue at all during closing arguments.  Further, the trial judge instructed the jury with CALCRIM No. 222, which stated in relevant part:  "Nothing that the attorneys say is evidence. . . . Their questions are not evidence.  Only the witnesses' answers are evidence. . . .  Do not assume that something is true just because one of the attorneys asked a question that suggested it was true."  We presume that the jury followed its instructions and did not consider the prosecutor's questions as evidence.  (See *People v. Chhoun*, *supra*, 11 Cal.5th at p. 30.)  Moreover, as discussed, there was overwhelming evidence of Landers's guilt for the murder and ample evidence of a motive, namely that Toca had slashed Williams's tire.  Based on the circumstances, we conclude Landers has failed to demonstrate prejudice.  (See *People v. Young* (2019) 7 Cal.5th 905, 933 [prosecutorial misconduct was harmless because there was "no reasonable probability that the prosecutor's fleeting remark had any effect on the jury, particularly given the overwhelming evidence of defendant's guilt"]; *People v. Seumanu* (2015) 61 Cal.4th 1293, 1345 [prosecutor's misconduct was harmless where "the evidence of guilt was strong" and the court instructed the jury "that the arguments of counsel are not evidence"].)

VIII. *There is No Cumulative Error*

Landers argues the cumulative effect of the claimed errors deprived him of due process of law and a fair trial. "Cumulative error is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant. [Citations.] Although a defendant is entitled to a fair trial, he or she is not entitled to 'a perfect one.'" (*People v. Capers* (2019) 7 Cal.5th 989, 1017.) Since we have rejected all of Landers's claims of error, there is nothing to cumulate. Landers received a fair trial and has failed to show any error requiring reversal of his convictions.

IX. *The Court Did Not Err in Denying Landers's Request To Dismiss His Prior Strike Convictions and Firearm Enhancement*

As pertinent here, the trial court sentenced Landers to 75 years to life for the murder pursuant to the Three Strikes law and 25 years to life for the firearm enhancement. Landers contends the court erred in declining to dismiss his prior strike convictions and firearm enhancement under section 1385, subdivision (c), added by Senate Bill No. 81 (2021-2022 Reg. Sess.) We reject Landers's contentions.

A. *Section 1385, Subdivision (c), Does Not Apply to Prior Strike Convictions*

Section 1385, subdivision (c)(1), provides, "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute." Subdivision (c)(2) of section 1385 provides, "In exercising its discretion under this subdivision, the court shall consider and afford great weight

55

to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety."

Landers contends the language and legislative history of section 1385 indicate that a prior strike conviction constitutes an enhancement under section 1385. Specifically, Landers argues, "Because the purpose of section 1385, subdivision (c), is to reduce the disparities caused by penalty provisions that increase sentences, 'enhancement' should be given the broadest possible meaning to effectuate the statute's purpose. 'Enhancement' must mean a penalty allegation that increases a defendant's punishment beyond that authorized by the offense of conviction alone, including provisions of the Three Strikes law." We are not persuaded.

"Whether the amendments to section 1385 apply to prior strike convictions is a question of statutory interpretation which we review de novo." (*People v. Burke* (2023) 89 Cal.App.5th 237, 242 (*Burke*).) *Burke* squarely addressed the argument made by Landers, holding as follows: "It is . . . well established that the Three Strikes law is not an enhancement; it is an alternative sentencing scheme for the current offense. . . . Because the statutory language is clear and unambiguous, we follow its plain meaning and do not consider the legislative history cited by defendant. . . . The plain language of subdivision (c) of section 1385 applies only to an 'enhancement,' and the Three Strikes law is not an enhancement." (*Burke*, at pp. 243-244.) Since *Burke*, every court that has addressed the issue has agreed with its

56

holding.  (*People v. McDowell* (2024) 99 Cal.App.5th 1147, 1155-1156; *People v. Dain* (2024) 99 Cal.App.5th 399, 410-411, review granted May 29, 2024, S283924; *People v. Olay* (2023) 98 Cal.App.5th 60, 68-69; *People v. Tilley* (2023) 92 Cal.App.5th 772, 776, fn. 2.)  We decline to break with this authority.  Because a strike is not considered an enhancement, section 1385, subdivision (c), did not require the trial court to dismiss Landers's prior strike convictions.

B.    *The Court Was Not Required to Dismiss the Firearm Enhancement*

Relying on section 1385, subdivision (c)(2)(B), Landers argues the court had a mandatory duty to dismiss the firearm enhancement.  That provision states that when "multiple enhancements are alleged in a single case," "all enhancements beyond a single enhancement shall be dismissed."  (§ 1385, subd. (c)(2)(B).)

While the language " 'shall be dismissed' " suggests dismissal is mandatory, we have previously held this language must be considered in the " ' "context of the statute as a whole." ' " (*People v. Anderson* (2023) 88 Cal.App.5th 233, 239, review granted Apr. 19, 2023, S278786.)  We concluded in *Anderson* that "the trial court has discretion to dismiss sentencing enhancements; certain circumstances weigh greatly in favor of dismissal; and a finding of danger to public safety can overcome the circumstances in favor of dismissal."  (*Ibid.*, fn. omitted; accord, *People v. Renteria* (2023) 96 Cal.App.5th 1276, 1284-1289; *People v. Mendoza* (2023) 88 Cal.App.5th 287, 295-297; *People v. Lipscomb* (2022) 87 Cal.App.5th 9, 17-21.)  The trial court here found Landers presented a danger to society.  Landers has not provided us with a reason to depart from our prior holding that a

trial court retains discretion to not dismiss enhancements under section 1385, subdivision (c)(2)(B), when, as here, it finds the defendant would pose an unreasonable risk of danger to the public.

C. *The Court Did Not Abuse Its Discretion by Declining to Dismiss the Firearm Enhancement*

Landers also argues the court abused its discretion in declining to dismiss the firearm enhancement because it did not properly consider whether Landers would be a danger to public safety "*upon release*."

We review the trial court's refusal to dismiss an enhancement under section 1385 for abuse of discretion. (*Nazir v. Superior Court* (2022) 79 Cal.App.5th 478, 490.) "A trial court may abuse its discretion where 'its decision is so irrational or arbitrary that no reasonable person could agree with it,' 'where the trial court was not "aware of its discretion" ' to dismiss a sentencing allegation under section 1385, or 'where the court considered impermissible factors in declining to dismiss.' " (*Id.* at pp. 689-690.)

The court properly considered whether Landers was a danger to public safety. The trial court found "Landers has demonstrated that he constitutes a danger to public safety" based on the brutality of the murder. Specifically, the court noted Landers had a relationship with Toca for years and yet shot her 14 times, including in the face.

Landers cites *People v. Williams* (2018) 19 Cal.App.5th 1057, for the proposition that, when considering whether a defendant would pose a danger to public safety, the trial court must conduct a "forward-looking inquiry" and "look to when a defendant would be released." (*Id.* at p. 1063; accord, *People v.*

58

*Gonzalez* (2024) 103 Cal.App.5th 215, 228-229.)  Landers contends the trial court did not consider his future danger to public safety.

"'The trial court is not required to state reasons for declining to exercise its discretion under section 1385' [citations], and 'is presumed to have considered all of the relevant factors in the absence of an affirmative record to the contrary' [citation]." (*People v. Brugman* (2021) 62 Cal.App.5th 608, 637.)  "When, as here, the record is silent as to whether the court conducted a forward-thinking inquiry, we presume the court ' "correctly applied the law." ' " (*Ibid*.)  Nothing in the record rebuts that presumption.  The court did not abuse its discretion.

## X.     *The Court's Restitution Order Was Improper*

Landers contends the abstract of judgment and court minutes should be corrected to reflect a $300 restitution fine (§ 1202.4, subd. (b)) and a $300 stayed parole revocation restitution fine (§ 1202.45).  We agree.

According to the reporter's transcript from Landers's sentencing hearing in October 2022, the trial court stated the following regarding restitution:  "Normally, I would impose the maximum restitution fine.  I'm going to impose $5,000.  [¶] There's a restitution fine of $300, a probation PRCS revocation restitution fine in the same amount which will be stayed until parole or PRCS is revoked and defendant is returned to prison."  The abstract of judgment and minute order from the sentencing hearing indicate Landers was ordered to pay a restitution fine of $5,000 and a stayed parole revocation restitution fine of $5,000.

"Entering a judgment of the trial court in the minutes is a clerical function.  Any discrepancy between the minutes and the oral pronouncement of a sentence is presumed to be the result of

59

clerical error.  Thus, the oral pronouncement of sentence prevails in cases where it deviates from that recorded in the minutes." (*People v. Price* (2004) 120 Cal.App.4th 224, 242; accord, *People v. Mesa* (1975) 14 Cal.3d 466, 471 ["Nor is the abstract of judgment controlling.  'The abstract of judgment is not the judgment of conviction' "], superseded by statute on other grounds as explained in *People v. Turner* (1998) 67 Cal.App.4th 1258, 1268.) Ordinarily, this principle of law would allow us to conclude that the trial court's oral pronouncement of the fines is the definitive sentence, but the oral pronouncement was ambiguous.  The trial court stated it was "going to impose $5,000," but then immediately followed that by saying the fine was "$300."

Where the oral pronouncement itself is ambiguous, we conclude the ambiguity is best resolved in favor of the court's final pronouncement.  Since the court's final pronouncement of the sentence was $300 for the restitution fine and the "same amount" stayed for the parole revocation restitution fine, the abstract of judgment and court minutes should be corrected to reflect that.

### *DISPOSITION*

The matter is remanded for the trial court to correct the abstract of judgment and court minutes so that they reflect a $300 restitution fine and a $300 stayed parole revocation restitution fine.  In all other respects, the judgment is affirmed.


STONE, J.

We concur:


MARTINEZ, P. J.                    FEUER, J.


60